**RICHARD R. BEST**
**REGIONAL DIRECTOR**
**A. Kristina Littman**
**John O. Enright**
**Richard G. Primoff**
**Alison R. Levine**
**Pamela Sawhney**
**Jon A. Daniels**
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0148 (Primoff)**
**Email: primoffr@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| : | |
| **Plaintiff,** : | |
| : | **COMPLAINT** |
| -against- : | |
| : | **21 Civ. 0529** |
| **KRISTIJAN KRSTIC (a/k/a FELIX LOGAN),** : | |
| **JOHN DEMARR, AND ROBIN ENOS** : | **ECF CASE** |
| : | |
| **Defendants.** : | **JURY TRIAL** |
| : | **DEMANDED** |
| : | |

-----------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants Kristijan Krstic (a/k/a Felix Logan) ("Krstic"), John DeMarr ("DeMarr"), and Robin

Enos ("Enos") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.     From approximately December 2017 through May 2018 (the "Relevant Period"),

Krstic and DeMarr engaged in a fraudulent scheme, with the knowing and substantial assistance

of Enos, to induce the investing public to buy securities in two online companies, "Start Options" and "Bitcoiin2Gen," in illegal unregistered securities offerings.

2.      Start Options and Bitcoiin2Gen in fact served principally as vehicles for Defendants DeMarr and Krstic to misappropriate investor funds.  By the time their schemes collapsed, they had fraudulently raised, directly or through affiliates and promoters, at least $11.4 million from more than 460 investors in Start Options and Bitcoiin2Gen, none of which has been returned to investors.

3.      Krstic and DeMarr sought to capitalize on the investing public's interest in digital assets.  From approximately December 2017 through late January 2018, Krstic (using a fake name) and DeMarr touted Start Options' purported digital asset mining and trading platform, which they falsely claimed was "the largest Bitcoin exchange in euro volume and liquidity" and "consistently rated the best and most secure Bitcoin exchange by independent news media."

4.      Then, from late January 2018 through May 2018, Krstic and DeMarr began promoting Bitcoiin2Gen and the sale of its so-called B2G tokens, as part of an illegal unregistered and purported initial coin offering ("ICO").  During this period, they ignored Start Options investors' requests for redemption and required them to roll their investments into B2G tokens.  Enos drafted the fraudulent promotional materials he knew DeMarr and Krstic were disseminating to the investing public in connection with these offerings.

5.      Defendants fraudulently claimed, among other things, that the B2G tokens they were selling were distributed to investors on the Ethereum blockchain, that investors' funds were being used to develop a coin that was "mineable," and that the B2G tokens were trading on a proprietary digital asset trading platform at their "launch" in early April 2018.

6.      In reality, Bitcoiin2Gen was a sham.  Enos knowingly or recklessly drafted, and

DeMarr and Krstic knowingly disseminated, fictitious technical white papers and fake websites to create the misleading appearance that the B2G tokens were genuine digital assets that were trading on the Ethereum blockchain, when they knew or recklessly disregarded that they were not. They also disseminated false and misleading misrepresentations, and omitted material facts regarding, among other things, the use of investor funds and the background and qualifications of the Bitcoiin2Gen project's principals.

7.    DeMarr fraudulently misappropriated at least $1.8 million—nearly half of the fiat currency he raised from investors—for his own personal benefit, including car payments and personal credit card debts. Krstic, meanwhile, received more than $9 million of investor funds in fiat currency and digital assets. He abruptly announced his exit from the Start Options scheme without explanation on April 27, 2018, and has not returned any of these funds to investors. Enos, who was largely dependent on DeMarr as a source of income during the Relevant Period, received approximately $12,000 for his assistance to their fraudulent scheme.

**VIOLATIONS**

8.    By virtue of the foregoing conduct and as alleged further herein, Defendants Krstic and DeMarr have violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; have aided and abetted Start Options' and Bitcoiin2Gen's violations of Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and DeMarr violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]. Defendant Enos aided and abetted the foregoing violations by Krstic, Demarr and Bitcoiin2Gen of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

9.     Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

11.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to 15 U.S.C. § 78u(d)(5) and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7); (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendants from participating, directly or indirectly, in the issuance, purchase, offer, or sale of any digital asset security; (e) permanently barring Krstic and DeMarr from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e) and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (f) ordering any other and further relief the Court may deem appropriate or necessary for the benefit of investors.

## JURISDICTION AND VENUE

12.     The Commission has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this district under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of New York.  Among other things, Defendants' false and misleading statements were made to the public at large in this District and several victims of Defendants' fraudulent conduct reside in, and invested in Bitcoiin2Gen and Start Options from within, this District.

## DEFENDANTS

15.     **Kristijan Krstic (a/k/a/ Felix Logan)**, is a Serbian-Australian national who was domiciled in the Philippines during the Relevant Period.  Upon information and belief, he is currently in custody in Serbia.  From November 2017 through May 2018, Krstic founded, controlled and served as the "CFO" of Start Options under the pseudonym "Felix Logan," and founded and controlled Bitcoiin2Gen, also under the same pseudonym.

16.     **John DeMarr**, age 56, currently resides in Seal Beach, California.  DeMarr has been a private detective since 1988 and runs his own private investigations firm in California called John A. DeMarr PI – Investigation Services. During the Relevant Period, DeMarr served as the primary promoter in the U.S. for Start Options and Bitcoiin2Gen.

17.     **Robin Enos,** age 68, currently resides in San Pablo, California.  Enos was a lawyer in California but resigned his license to practice while facing disciplinary charges in 2011.  Enos subsequently purported to offer legal services in Nevada—despite not being licensed

to practice law in the state—and was ultimately sanctioned and fined for his activities after a client had funds stolen by a company for which Enos claimed to serve as general counsel.  Since at least 2017, DeMarr has been Enos' primary source of income.

### OTHER RELEVANT ENTITIES

18.     **Start Options** was an online company, with a publicly-accessible website that was located at www.startoptions.com (the "Start Options Website").  Start Options was never registered with the Commission in any capacity.

19.     **Bitcoiin2Gen** was an online company, with a publicly-accessible website that was located at www.bitcoiin.com (the "Bitcoiin2Gen Website").  Bitcoiin2Gen also maintained a social media presence on Facebook, Twitter, and various blogs, and issued dozens of press releases on the internet accessible to the general public.  Bitcoiin2Gen was never registered with the Commission in any capacity.

20.     **Dragon Mining Tech** was an online entity created by Krstic and his affiliates that claimed to create hardware that could be used to "mine" B2G tokens.

21.     **Thorex** was a digital asset platform purportedly created by Krstic and his affiliates that Defendants claimed allowed for the trading of B2G tokens in exchange for other digital assets or fiat currencies.

I.      **BACKGROUND**

A.      **Digital Assets and ICOs**

22.     The term "digital asset" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including so-called "cryptocurrencies," "coins," and "tokens."  Entities have offered and sold digital assets in fundraising events, called "initial coin offerings" or "ICOs," in exchange for consideration, often other digital assets.

23.     A blockchain or distributed ledger is a peer-to-peer database spread across a

network that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions. Blockchains or distributed ledgers can also record "smart contracts," essentially computer programs designed to execute the terms of a contract when certain triggering conditions are met.

24. Digital tokens may also be traded on digital-asset trading platforms where they are tradeable for other digital assets or fiat currency. The tokens are often tradeable upon delivery to investors.

25. ICOs are typically announced and promoted through public online channels. The documents soliciting the public to acquire digital assets in a particular offering are usually in the form of a "white paper," *i.e.*, marketing materials describing the project and the terms of the ICO. To participate, investors may transfer funds to a unique digital address set up by the issuer, and the issuer may deliver digital assets to an ICO participant's unique digital address on a distributed ledger or blockchain.

26. Issuers may launch digital assets in ICOs that appreciate in value in the hands of investors. Issuers have also raised millions of dollars in fraudulent ICOs. On July 25, 2017, the SEC issued the "DAO Report of Investigation," where it noted that digital assets sold in ICOs may be securities subject to the federal securities laws.[1]

27. On November 1, 2017, the Commission's Division of Enforcement and Office of Compliance Inspections and Examinations issued the "SEC Statement Urging Caution Around Celebrity Backed ICOs" ("Celebrity ICO Statement"), which noted that, in accordance with the anti-touting provisions of the federal securities laws, "[a]ny celebrity or other individual who

---

[1] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Rel. No. 81207 (July 25, 2017).

promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion."[2]

**B.    Krstic's Alleged Involvement in Previous Fraudulent Online Investment Schemes**

28.    Since at least 2012, Krstic and his prior online investment schemes have been the subject of public allegations of fraud in the U.S. and abroad.

29.    In December 2012, for example, Krstic was identified on one internet forum as being linked to the fraudulent online investment schemes "binaryoptionsexposed.com," and online broker "bankoptions.com."

30.    In 2013, the Ontario Securities Commission placed Krstic's company, Krisworld Development Limited, "doing business as binary optionsexposed.com, option-world.com, bank-options.com, and signaliforex.com" on its regulatory warning list.

31.    In April 2015, the online publication "Behind MLM," published the first of several articles suggesting that the website "Options Rider" was likely a fraudulent Ponzi scheme, and that the domain, and the domain name of the affiliated website bancdeoptions.com, were linked to Krstic and/or his company, Krisworld, with a purported address in Hong Kong.

32.    Similarly, in August 2016, a liquidator in Australia publicly released a detailed report alleging that Krstic was a shadow director of a company that operated a $4.5 million unlicensed pyramid scheme.

**II.    KRSTIC AND DEMARR OFFER AND SELL START OPTIONS SECURITIES IN UNLAWFUL UNREGISTERED TRANSACTIONS**

**A.    Krstic Initiates the Start Options Scheme Under a False Identity**

33.    In the fall of 2017, Krstic and his overseas affiliates began marketing a new

---

[2] The Celebrity ICO Statement is available at: https://www.sec.gov/news/public-statementstatement-potentially-unlawful-promotion-icos.

investment scheme called "Start Options," through the publicly-accessible Start Options Website, whose domain name was registered by Krstic's family members.

34.    To avoid the possibility that prospective investors would connect Start Options to Krstic and discover his prior involvement with allegedly fraudulent activity, Krstic created and hid behind the false identity "Felix Logan."  Krstic created an email account in that name, and used that fake identity for all purposes in connection with Start Options (and, as discussed below, later with Bitcoiin2Gen), including all communications with the public and prospective investors.

35.    Krstic controlled all aspects of Start Options, including, among other things, by: (1) developing its website; (2) creating its marketing materials; (3) hiring the company's promoters; and (4) deciding how investor funds were spent.  According to several press releases that the company issued in February 2018, Krstic was identified (via his "Felix Logan" pseudonym) as the company's Chief Financial Officer.

36.    In marketing materials and on the Start Options Website, Krstic claimed that Start Options was an online investment platform that provided "cryptocurrency" mining, trading, and digital asset trading services.

**B.    DeMarr Joins Krstic in the Start Options Scheme**

37.    In the fall of 2017, DeMarr and a business associate ("Affiliate 1") became interested in trading in and profiting from selling digital assets, such as Bitcoin ("BTC").

38.    In or about November 2017, Krstic, who was looking for U.S.-based promoters to generate investor interest in Start Options, was introduced to DeMarr through a prospective investor who had worked with DeMarr in other multi-level marketing schemes.  Krstic communicated with DeMarr by telephone and email using his fake "Felix Logan" identity.

39.     In these communications, DeMarr and Krstic discussed the Start Options platform and its purported "Crypto Currency Mining and Trading program."  They also discussed how they would register the Start Options Website and how DeMarr would be paid to promote Start Options in the U.S.

40.     On or about November 17, 2017, DeMarr and Start Options entered into an agreement entitled "Start Options Master Affiliate Agreement for North America 2017" (the "Master Agreement") pursuant to which DeMarr would help to "promote and market the Start Options Platform" in the U.S. in exchange for a "revenue share" based on a pyramidal commission structure for each investment made by clients solicited by DeMarr.  Under the terms of the agreement, Krstic agreed that DeMarr was to receive a 30% commission on investor funds he brought in directly, with lower commission percentages (ranging from 5% to 20%) for investor funds brought in, for example, by his investors (or "clients"), or his investors' investors.

41.     In emails dated on or about November 22, 2017 to November 30, 2017, Krstic emailed DeMarr with details on how investments received by DeMarr from investors were to be sent to Krstic.  Specifically, Krstic provided deposit details to a bank account located in Manila, Philippines, for investments made in U.S. dollars, as well as a digital wallet address for investments made in digital assets.  Krstic also conveyed to DeMarr the two email addresses he used, and assisted him in obtaining access to the Start Options Website.

42.     Starting in December 2017, DeMarr worked with Krstic to redesign the Start Options Website to help attract investors.  DeMarr also recruited Enos, whom he knew to be a disbarred attorney, to help him ghost-write Start Options promotional materials, including press releases and edits to the Start Options Website.

C.    **Krstic and DeMarr Begin Offering and Selling Investment Contracts in December 2017**

43.    In approximately December 2017, Start Options, Krstic, and DeMarr began offering and selling investment contracts that they and their affiliates promoted through the Start Options Website, social media, and press releases (together, the "SO Marketing Materials").

44.    Krstic and DeMarr made the Start Options investment contracts available for purchase by individuals located in the U.S. and worldwide through the Start Options Website, and accepted investments in BTC, Ether ("ETH") or fiat currency, payable through credit card, bank wires or checks.

45.    According to the SO Marketing Materials, investors were required to deposit their funds for a specified contract period—60 or 90 days—after which investors could purportedly withdraw their money at a significant profit.

46.    According to the SO Marketing Materials, investors in Start Options had the option of investing in portfolios consisting of "digital asset mining" based on "mining hashrates, digital asset trading, or a tailored mix of both."

D.    **The Start Options Investment Contracts Were Securities**

47.    The SO Marketing Materials claimed that investors' money would be pooled together and used to fund Start Options' mining and trading efforts to be undertaken by Start Options.

48.    For example, Start Options claimed in one presentation emailed to investors and promoters in approximately December 2017, that it was "[o]ne of the pioneers in Bitcoin mining" and had "invested heavily in Mining rigs," allowing the company to "mine and trade Crypto Currencies" such as Bitcoin "at half its current market price" by "pooling funds in a

mining pool with a short term, 60 day trading period," which was "ample time for Start Options to realize mining and trading profits" at "low risk."

49.     The SO Marketing Materials guaranteed profits, stating that investors would realize profits between 25 and 60 percent for trading investors, 120 percent for mining investors, and as much as 200 percent for those opting for the most aggressive portfolio of investments, based on the company's purported sophisticated digital asset mining capabilities.

50.     During the Relevant Period, DeMarr worked at Krstic's direction as the "master representative for North America" to solicit U.S.-based investors to Start Options.

51.     DeMarr recruited a team of U.S.-based affiliates and promoters to help him tout Start Options, and, as discussed below, Bitcoiin2Gen.

52.     DeMarr tasked Affiliate 1 with incorporating and registering newly-formed entities and helping him to open bank accounts in the names of several companies DeMarr controlled to receive investor funds for Start Options (and as discussed below, Bitcoiin2Gen investments) via wire, credit card, or check.

53.     DeMarr also paid Affiliate 2, a website developer and designer, to format and publish on EINPresswire—an online newswire and news distribution service—all of the press releases DeMarr and Affiliate 1 drafted for Start Options, and as described below, Bitcoiin2Gen.[3]

54.     DeMarr led webinars with prospective investors, participated in investor calls, drafted and published press releases about Start Options, received money from U.S.-based investors, sent a portion of investor funds he received to the bank account that Krstic designated in the Philippines, and generally served as an intermediary between U.S.-based investors and Start Options.

_____

[3] *See* https://www.einpresswire.com/sources/u347502.

55.   For example, on January 7, 2018, DeMarr and another U.S.-based promoter held a 25-minute call for prospective investors in Start Options (the "January 7, 2018 Investor Call"). DeMarr and the promoter highlighted the Start Options platform's purported ability to generate profits for investors.  The promoter, for example, said he invested $1,000 into Start Options and that his account was worth over $50,000 a month later.

56.   DeMarr and Krstic communicated regularly on the phone, via email, and by messenger services about Start Options, and DeMarr understood that Krstic was the business's final decision-maker, including with respect to the commission structure used to pay promoters, the approval of marketing materials, the handling of any issues raised by investors, and the Start Options Website.

57.   For example, on December 12, 2017, DeMarr emailed Krstic regarding topics "To discuss in Madrid" and listed: "1) New site; 2) MLM software; 3) account min. to deposit and to start earning commissions.  4) commission structure from the past and going forward.  5) investment plans.  6) commission on commission.  7) commission on reinvestment after 90 days, or term.  8) company emails to be set up."

58.   Start Options, through the efforts of Krstic, DeMarr, and other promoters, in the SO Marketing Materials and in communications with prospective investors, touted the capabilities of its team and highlighted the company's ability to generate returns on investment by using its purported mining machines.

59.   For example, a presentation that one of Krstic's affiliates sent to prospective investors in approximately December 2017 stated that the Start Options team "specializ[es] in buying and selling crypto" and touted the company's use of high quality analytics for making

trading decisions, including "the competency of our bots and or [sic] traders." The presentation encouraged investors to let Start Options "do all the work for you, and you get paid!"

60.     On the January 7, 2018 Investor Call, DeMarr explained that the "family of the guys that own this company are very wealthy people . . . they've made a lot of money in cryptocurrency, . . . the owners of this company are in cryptocurrency because they love it and enjoy it, not because they need to. . . And so the company's backing is very strong." DeMarr also falsely stated:

> [h]undred percent, the mining is real. I've been to their one smaller facility that has 8000 machines in it. I walked through it myself, and they're adding another, I think, 3000 or 4000 while I was there. They have the programmers there doing their thing, so it's a real program.

61.     Start Options, through DeMarr and other promoters, also repeatedly touted Start Options' ability to generate returns for investors, based on the company's purported proprietary mining and trading activities. For example, on the January 7, 2018 Investor Call, DeMarr stated that "Start Options does progressive mining . . . Therefore, they can afford to pay a lot more money back to investors" than traditional cloud mining.

62.     In another example, a Start Options promotional offer DeMarr helped to draft and publish stated that if investors moved "one-third (33.3%) of the value of your current unpaid account, in [sic] StartOptions.com's new bitcoiin (B2G) fund . . . . This deposit will earn profits, and can be withdrawn 90 days after deposit."

63.     Similarly, on or about January 17, 2018, Start Options sent an email blast to prospective investors stating, among other things: "This is straight bitcoin mining, and pays 1% daily / 30% monthly."

64.     Another letter Start Options sent to prospective investors compared potential earnings in a bank savings account to a deposit in Start Options, contrasting the 1% that would

be earned on the bank deposit with "a conservative 30% avg return" on the Start Options investment.  The company explained that the "faster we mine and the more funds that are pooled, the greater the potential profit range – 30% - 60% per month."  The Start Options presentation also claimed that Start Options' exceptional mining capabilities guaranteed returns of 25-60% per month "based on our mining hashrates."

65.    A February 9, 2018 Start Options press release announced a "new program with the latest cryptocurrency Bitcoiin2Gen (B2G)" and stated:  "Start Options CFO Mr. Felix Logan showed his positive interest in Bitcoiin2Gen, our whole team working closely to capitalize on this opportunity . . . to make Bitcoiin2Gen more profitable for our investors" and by creating a new "B2G Mining Pool" where "our projected earnings in this program should be 80-90%."

66.    Between December 1, 2017 and January 26, 2018 alone, investors sent approximately $2.9 million worth of BTC and ETH to the Start Options digital wallet Krstic controlled as well as an account opened on CoinPayments.net, a digital asset payment processing service.  Investors, the majority of whom were based in the U.S., also sent approximately $1.3 million in fiat currency to a bank account in the U.S. that DeMarr controlled during the same period.

67.    No registration statement was ever filed with the Commission nor was any registration statement in effect, for any of these offers or sales of Start Options investment contracts, which were securities.  No exemption from the registration requirements under the federal securities laws were at any time applicable to these offers and sales.

## III.    KRISTIC, DEMARR AND START OPTIONS ENGAGE IN A FRAUDULENT SCHEME TO OFFER AND SELL START OPTIONS SECURITIES

68.    To lure prospective investors to purchase Start Options securities, Start Options— acting through Krstic, DeMarr, and other promoters—knowingly or recklessly made material

misrepresentations to investors and prospective investors, and omitted material facts necessary to make their representations not misleading.

69.     These misrepresentations and omissions concerned many important aspects of the company and the offering, including, among other things:  (1) the actual identity of the individual controlling Start Options; (2) the existence of operations for the purported Start Options business; and (3) the use of investor proceeds.

**A.      Krstic Conceals His True Identity to Offer and Sell Start Options Securities**

70.     As discussed above (¶¶ 28-32, *supra*), Krstic, before launching Start Options, had been the subject of numerous public allegations that he had conducted prior online investment scams. An internet search would have revealed these material facts to prospective investors.  To conceal his true identity from prospective investors in Start Options, Krstic invented a fictitious identity, "Felix Logan," to be the purported "CFO" of Start Options.

71.     To create this fake identity, Krstic created multiple "Felix Logan" e-mail addresses and a Twitter handle—(@felixlogan_CFO)—that he used to promote Start Options (and as discussed below, Bitcoiin2Gen).

72.     From approximately December 1, 2017 through April 27, 2018, Krstic repeatedly used the fake "Felix Logan" identity in emails with prospective investors and in web-based presentations and conference calls.  Krstic knew and falsely approved, or recklessly disregarded, that "Felix Logan" was identified in these communications as the CFO of Start Options.

73.     At no time during the Relevant Period did Krstic disclose to investors or prospective investors his true identity, or his prior involvement with alleged online investment schemes, omissions which made his and Start Options' representations of his fictitious identity materially misleading to prospective and actual investors in Start Options.

B.       **Material Misrepresentations about the Start Options Platform and Business**

74.      Krstic and DeMarr made numerous, purportedly factual representations to prospective and actual investors that were patently false through the Start Options Website and the SO Marketing Materials.

75.      For example, a Start Options presentation that Krstic and his affiliates emailed to investors and promoters claimed that Start Options was "the largest Bitcoin exchange in euro volume and liquidity" and that it was "consistently rated the best and most secure Bitcoin exchange by independent news media."

76.      Similarly, each of the Start Options press releases that Krstic and his affiliates helped to draft and publish, stated: "Start Options is one of the world's fastest growing Progressive Bitcoin Mining & Crypto Currency Trading, offering powerful yet user-friendly, in-house trading platforms for web and mobile to trade hundreds of assets - crypto currencies, commodities, stocks and indices."

77.      These representations were materially false.  Start Options was not rated "the best and most secure Bitcoin exchange" by "independent news media."  In fact, no news articles or widely-referenced digital asset websites that tracked information relating to digital asset trading platforms listed Start Options as a digital asset trading platform.

78.      DeMarr also falsely represented the factual due diligence he had conducted on Start Options to fraudulently enhance Start Options' credibility to prospective and actual investors.  For example, DeMarr falsely represented on the January 7, 2018 Investor Call, that Start Options had a "corporate office in Hong Kong" and "mining facilities in China" that he was "going back to" at the end of the month.  On that same call, he also stated: "Hundred percent, the mining is real.  I've been to their one smaller facility that has 8000 machines in it."

79.     In fact, DeMarr had not been to a Start Options office in Hong Kong and he had not been to any Start Options offices as of January 7, 2018 and thus could not have seen any mining rigs.

80.     The foregoing misrepresentations were material, and Krstic and DeMarr knew or recklessly disregarded that they were false and misleading when they made them.  Krstic and DeMarr knew or recklessly disregarded that Start Options did not have a large, fast-growing trading platform for cryptocurrency, and that it had not been well-reviewed by any independent news media.  In particular, the pair exchanged contemporaneous emails showing that they were aware of the relevant digital asset websites and media, demonstrating the falsity of these representations.

81.     Krstic and DeMarr knew or recklessly disregarded that DeMarr had never visited Start Options' purported Hong Kong offices, and had never conducted any due diligence to confirm the existence of mining equipment there.

82.     In fact, Krstic and DeMarr were each aware, while they were promoting the Start Options offering, of significant warnings that the foregoing representations were false and misleading.  By email dated December 18, 2017, for example, DeMarr forwarded to Krstic an email he had received from an individual who provided an "Update on the StartOptions.com scam," and suggested that the purported business address of Start Options in the Philippines was fictional, as it was merely a residential apartment.  DeMarr told Krstic in this email that "we need to fix this or this guy will hurt us! Call me."

83.     By email dated December 22, 2017, DeMarr also forwarded to Krstic a link to an article on the internet site "behindmlm.com"—the same site that had previously reported on one

of Krstic's earlier online investment schemes, *see* ¶ 31, *supra*—entitled "Start Options Review: A crypto mining & trading billion dollar company?"

84.    That article noted, among other things:  (1) that the company's purported Philippines address was that of a residential condominium and (2) that traffic-ranking data for the Start Options Website cast "solid doubt" on Start Options' claims about the size of its purported trading platform and that it was "one of the fastest growing Progressive Bitcoin Mining & Crypto Currency Trading [*sic*]."

85.    Enos, furthermore, throughout the Relevant Period, repeatedly raised to DeMarr his suspicions that Krstic's operations were illegitimate.

## C.    DeMarr Misleads Investors About the Liquidity of Their Investments and How the Proceeds of Their Investments Will Be Used

86.    Start Options, Krstic, and DeMarr knowingly or recklessly misrepresented to prospective and actual investors how the funds they invested in Start Options would be used and omitted material facts necessary to make those statements not misleading.

87.    The SO Marketing Materials that Krstic and DeMarr helped prepare and publish claimed that investor funds would be pooled together and invested in digital asset mining and digital asset trading platforms that would earn investors a profit after a certain number of days, after which time investors could withdraw their funds.

88.    Indeed, throughout late 2017 and early 2018, Krstic and his affiliates created portals on the Start Options Website for investors to track their purported investments in real time.  Investors' portals showed their purported "Trading Balance," depicted in USD; their purported "Mining Balance," reflecting the amount of purported BTC they owned; and their "managed trading investment," "managed trades (today)," and "Daily Profit."  Under a "mining" tab, the portal showed the "Calculated hashrate," "Average hashrate for the last 6 hours,"

account "Balance" in BTC, and "Current balance in USD." These portals also purported to show that the contributed funds were growing at a profitable rate.

89.    After viewing these purported profits, investors added additional sums of money and recruited others.

90.    For example, one investor explained on a webinar that he had made over $1,100 in profit, from an initial investment of $1,000, in 5 days from Start Options' mining. Another investor's personal online account showed his $35,000 investment made in February 2018 being worth as much as $1 million only several months later, by April 2018.

91.    DeMarr also represented to prospective investors that the funds they paid into Start Options would be used to purchase business equipment. For example, on the January 7, 2018 Investor Call, DeMarr said: "The owner has already said, look, when the money comes in, if it does not buy equipment and work for the client like we say it is, we will not take any more money. We will stop until we can buy new equipment."

92.    During the Relevant Period, Krstic and DeMarr failed to disclose the existence of the Master Agreement in the SO Marketing Materials, the Start Options Website, or in calls to actual and prospective investors. Nor did they disclose to investors that DeMarr would be taking 30% or more of their investments to use for his own personal benefit, even while telling investors how their funds would be put to use. DeMarr and Krstic knew or recklessly disregarded that these omissions were material and otherwise made their claims regarding the use of investor funds misleading.

93.    While making these false and misleading claims and omitting this information, DeMarr was simultaneously siphoning off approximately half of the investor funds he obtained in fiat currency. From December 1, 2017 to January 26, 2018, DeMarr raised approximately

$1.3 million in fiat currency from investors.  DeMarr transferred those funds to a bank account

he controlled, and spent more than $700,000 on his own personal expenses, including car

payments and personal credit card debts.

94.    Krstic knew or recklessly disregarded that DeMarr was misappropriating these

funds from investors, as he had secretly agreed that DeMarr could do so under the Master

Agreement.  In addition, Krstic was receiving daily reports from DeMarr and/or Affiliate 1 that

showed how much money DeMarr took for himself.

95.    Start Options, through Krstic and DeMarr, also falsely represented to investors on

the Start Options Website that their investments were liquid.  In its Frequently Asked Questions

page, the website claimed: "Unless your investment is in a fixed-term mining plan, you may

withdraw funds from your account at any time."

96.    DeMarr knew or recklessly disregarded that this was false.  Beginning in

approximately February 2018, DeMarr began receiving emails from Start Options investors who

complained that they were unable to withdraw their investments and commissions, as they had

been promised.  Defendants nonetheless continued to falsely claim that investors could do so on

the Start Options Website, and DeMarr continued to simultaneously and secretly take half of

investors' fiat currency investments for his own personal use.

97.    Ultimately, and notwithstanding the representations made to investors on the Start

Options portal (*see* ¶ 88, *supra*) Start Options investors, like Bitcoiin2Gen investors, were never

able to redeem their investments, which totaled at least $4.2 million in cryptocurrency and fiat

currency.  Indeed, in response to their demands, Start Options investors received either silence or

were required by Defendants to roll over their investments into Defendants' Bitcoiin2Gen

scheme, or risked forfeiting their investments.

IV.    **KRSTIC AND DEMARR OFFER AND SELL B2G TOKENS IN UNLAWFULLY UNREGISTERED TRANSACTIONS**

A.    **The Bitcoiin2Gen Digital Asset Offering and Sale**

98.    In late January 2018, Krstic and DeMarr launched a second, related scheme—an unregistered offering of B2G tokens conducted through an ICO (the "B2G ICO"). The B2G tokens were to purportedly be issued as digital tokens on the Ethereum blockchain in advance of Bitcoiin2Gen's purported launch of a mineable, tradeable cryptocurrency.

99.    Bitcoiin2Gen conducted this ICO publicly from approximately January 27, 2018 through approximately March 26, 2018, but continued to solicit investments for the ICO through May 31, 2018 (the "B2G ICO Period"). In total, Bitcoiin2Gen received approximately $7.2 million from more than 435 investors during the B2G ICO Period.

100.    No registration statement was ever filed with the Commission or in effect at any time for the B2G ICO, and no exemption from the federal securities laws' registration requirements applied.

101.    Krstic, DeMarr, and Bitcoiin2Gen promoted the B2G ICO and B2G tokens through the Bitcoiin2Gen Website, social media pages such as Facebook and Twitter, investor calls, Whitepapers, and dozens of press releases (together "the B2G Marketing Materials"), all of which DeMarr, Enos, and/or Krstic and his affiliates drafted, edited, and approved before dissemination.

102.    During the B2G ICO Period, B2G tokens were available for purchase by individuals in the U.S. and worldwide through the Bitcoiin2Gen Website, as well as directly through DeMarr and other promoters.

103.    According to the B2G Marketing Materials, participants in the B2G ICO could buy one B2G token for $5 U.S. Bitcoiin2Gen sold B2G tokens in exchange for BTC or fiat

currency, including U.S. dollars and Euros.

104.    The Bitcoiin2Gen White Paper, which was published on the Bitcoiin2Gen Website during the B2G ICO Period, described the ICO as a "crowdfunding" opportunity to raise capital to build an "ecosystem" that would allow users to "purchase Bitcoin B2G; and to trade Bitcoiin B2G, altcoins and fiat currencies on a secure, comprehensive platform." According to the Bitcoiin2Gen White Paper, "our vision for Bitcoiin B2G, the second-generation cryptocurrency built to improve on the original bitcoin, is to engineer a truly self-sufficient coin."

105.    On or about February 6, 2018, Defendants disseminated the following Start Options press release: "Start Options CFO, Mr. Felix Logan announced they [sic] going to add Bitcoiin2Gen (B2G) in [sic] their Mining& Trading platform." The release stated "Investors will be able to trade B2G in the first week of April 2018" and that "its [sic] important to diversify the portfolio to lessen the risk causing by [sic] the constantly fluctuating prices of Bitcoin. Adding a new coin will make mining more profitable business due to the low percentage of difficulty to mine a new coin."

106.    Several days later, on or about February 9, 2018, Defendants announced on Start Options' website that it was creating "a new mining pool 'B2G Mining Pool' with the latest cryptocurrency Bitcoiin2Gen (B2G)." The release claimed that B2G "is a new coin and we will be one of the pioneers who will mine this coin . . . our projected earnings in this program should be 80-90%."

107.    That same day, Start Options also announced a "new program" with Bitcoiin2Gen, where every investor could take advantage of "Buy 1 Get 1 Free" in the period 90 days for the minimum deposit of 1 BTC.

108.    Start Options, Krstic, and DeMarr initially made a "special offer" to Start Options' investors and other investors to roll over their Start Options accounts into new B2G mining accounts.

109.    On or about February 2, 2018, at DeMarr's direction, Enos and Affiliate 2 drafted and disseminated an email blast to Start Options' investors and other digital asset investors entitled "special buy out offer – limited time only."  The email stated, "The owner of Start Options would like to make the following offer.  He will buy out your account for the full value in USD" if the investor paid additional fiat or digital assets worth 1/3 of the value of the current contract, or transferred the value of their account to Start Options, where it would purportedly be placed in a "separate progressive mining account for 90 days" after which time "all funds will be concerted to B2G [tokens]," which can be sold "on the private or open exchange systems."  Start Options posted a similar announcement to its website.

110.    Ultimately, however, Krstic and Start Options gave Start Options investors no choice at all:  they never "bought out" Start Options investors with U.S. dollars, and instead required investors to roll their purported Start Options investment contracts into purported B2G mining and trading investments.  At that point, investors' online portal accounts listed the purported value of their accounts in B2G tokens, rather than the other tokens Start Options was purportedly mining or trading.

**B.**    **Defendants Claimed Bitcoiin2Gen's Management of the Pooled Investments Would Increase the Value of B2G Tokens**

111.    Investors in the B2G ICO had a reasonable expectation of profits based on the efforts of Bitcoiin2Gen's management team, controlled by Krstic.  The Bitcoiin2Gen Marketing Materials that Defendants disseminated stated that Bitcoiin2Gen would use the proceeds of the

B2G token offering to build an "ecosystem," which would create demand for B2G tokens and thus make them more valuable.

112.    The Bitcoiin2Gen Marketing Materials emphasized investors' "unique opportunity" to invest in B2G tokens during the ICO at "half the launch price"; and the company's creation of its "unique eco-system," which would "provide a faster, safer and more interactive P2P service while starting at a price at which the original [Bitcoin] was in 2012."

113.    According to the Bitcoiin2Gen Marketing Materials, the company claimed it would be pooling investors' funds to achieve its goals.  The company claimed it would finance the project's goals through this "crowdsale," with a $75 million "Soft Cap" and a $250 million "Hard Cap," which "would make it possible to implement the project quicker and also include a larger marketing [sic] manufacturing, technical development team."

114.    Bitcoiin2Gen's Website and White Paper also included a timeline, which depicted the following:  (1) "April 2018 Windows/Mac Wallet Launch. Purchase and deployment of purpose based mining machines developed by Dragon Mining.  $100.000.000 total investment"; (2) "May 2018 Start of development for further/additional core features of the all-in-one solution"; (3) "June 2018 Launch of world-wide Mining Pool program through B2G"; (4) "July 2018 Development of Android/ICO wallet app for B2G"; and (5) "December 2018 Projected B2G price at $388 for one B2G."

115.    DeMarr and other promoters held multiple calls with potential investors to promote the B2G ICO and disseminate information about Bitcoiin2Gen's purported plans to develop the "ecosystem."

116.    Krstic (under the guise of his "Felix Logan" pseudonym) participated in several investor calls, including on a call with the celebrity Steven Seagal in which Krstic and Seagal

promoted the B2G ICO.

117.    Krstic, pretending to be Felix Logan, also talked to several U.S.-based prospective and actual investors on the telephone about the Bitcoiin2Gen opportunity.

118.    During investor calls, DeMarr highlighted the managerial and entrepreneurial efforts of Bitcoiin2Gen's management.  For example, on a February 15, 2018 call with prospective and actual investors (the "February 15, 2018 Investor Call"), DeMarr highlighted the purported expertise of the Bitcoiin2Gen team, claiming that "some of the developers [of Bitcoiin2Gen] came from the original Bitcoin team and some came from the Bitcoin cash team[,] and in our industry, everybody knows who these people are."

119.    In addition, the Bitcoiin2Gen press releases that DeMarr published on EIN Presswire repeatedly and consistently emphasized Bitcoiin2Gen's management, stating that B2G ICO represented a "unique opportunity" to "participate in the exhilarating launch of an integrated ecosystem, with built-in controls, strong management and explosive upside growth potential."

120.    In addition to describing the planned "ecosystem" that would increase the value of the B2G tokens, the Bitcoiin2Gen Marketing Materials contained numerous explicit statements that the B2G tokens would rise in value, and that, at a minimum, investors would receive a guaranteed return each month.

121.    Similarly, the Bitcoiin2Gen White Paper and Bitcoiin2Gen Website claimed that the B2G ICO gave investors a chance to "acquire BitcoiinB2G at half the launch price."

122.    The B2G Marketing Materials also projected, without any factual basis, that each B2G token—originally offered at $5—would be worth $388 by December 2018.

123.    Bitcoiin2Gen promoters then quoted this baseless price increase projection in investor calls.  For example, on a February 15, 2018 investor call, in which DeMarr participated,

a promoter stated: "And it's estimated that by the end of the year, the coin value can potentially go up to $388, and if that's the case, we're looking at an 8000 percent gain." DeMarr stated on that same call, without evidence, that he personally thought the B2G token would rise in value about 20 times.

124.    On February 5, 2018, DeMarr sent an email to a prospective investor and promoter about the B2G ICO, stating that when the B2G token became "live" on March 25, it "will be mineable from day one[,] which will greatly increase its value" because "there are only 10 mineable coins, with the exception of ETC—the lowest price of a mined coin is about $180.00." DeMarr further falsely represented that the token "will be 100% self sufficient as it will have its own secure wallet to purchase and hold, and transfer and its own exchange." He then claimed that this "will provide 100% liquidity to sell the coins and receive a bank wire, or you can convert to BTC or ETH and simply withdraw."

125.    The Bitcoiin2Gen Website compared cryptocurrency trading to stock trading:

BITCOIIN TRADING: Bitcoiin2Gen gives investors the opportunity to buy and sell [B2G tokens] through various different exchanges through the world, through its complete coin status investors can freely buy and sell the crypto currency from day one. Cryptocurrency trading is similar to trading stocks, where people buy a particular cryptocurrency and wait for it to increase in price. In other words, if you put your own money into [sic] buy a cryptocurrency with hopes of its value rising so that you can sell it for a profit-you're an investor.

126.    The Bitcoiin2Gen Website and prior press releases also stated that Bitcoiin2Gen's operations would earn investors a dividend-like "reward"—1% per month and 12% per year—by simply holding their B2G tokens. According to the website: "You can earn considerable profit from holding Bitcoin B2G [sic]. All tokens held in your in-ecosystem wallet will pay interest. . . . The 1% monthly reward is posted to depositors's [sic] token accounts from our mining operation."

127.    A February 7, 2018 Press Release stated: "B2G offers an opportunity not seen since the original [B]itcoin offering in 2009 - a fresh chance to catch the wave, a chance for ordinary people around the world to participate in an Initial Coin Offering, with a modest investment and the possibility of excellent, maybe even fabulous returns."

128.    DeMarr, at Krstic's direction, also used investor funds to pay for the following advertisement on Sirius XM radio, which Krstic pre-reviewed and approved:

> If you missed the wave when Bitcoin first launched, here's your second chance. Bitcoiin 2.0 just launched a limited initial coin offering of just $5. This offer ends March 14th. The cryptocurrency marketplace is not going away. Secure your ownership for just $5. Visit bitcoiin.com. That's bitcoiin.com. Don't forget. It's bitcoiin with two I's in the word coin. Bitcoiin.com or call 877-220-1969. Don't miss the wave again."

129.    As early as February 2018, Bitcoiin2Gen, Krstic, and DeMarr also highlighted in marketing materials that investors would have the ability to liquidate and trade B2G tokens on "Ethereum-based blockchain token platforms" following the token sale.

130.    Bitcoiin2Gen, Krstic, and DeMarr also repeatedly touted the development of Bitcoiin2Gen's own "cryptocurrency exchange platform," ultimately named Thorex, which would purportedly give B2G token holders the ability to transfer B2G tokens into "top altcoins and Fiat currencies at the best market rate."

131.    For example, on April 9, 2018, Bitcoiin2Gen announced that the B2G token was now "live and listed on our cryptocurrency exchange Thorex.net." That same day, DeMarr published a press release that stated: "Thorex.net implements instant transfers from Bitcoiin B2G, or other cryptocurrencies held in Thorex.net wallets, to fiat currencies." The Thorex website claimed that "Thorex is the most user friendly crypto currency exchange," that Thorex charged a fixed fee of 1.5% on every successful transactions, and that Thorex offered "safe and fast transactions."

132.     Finally, as part of its "Referral Commission – Partner Program," Bitcoiin2Gen encouraged early investors to recruit additional investors, with the promise of guaranteed commissions.  These investors would earn commissions based on their recruits' revenues, which were in turn based on their recruits' earnings, as depicted in the following pyramid-shaped diagram:



## V.     KRSTIC, DEMARR, AND BITCOIIN2GEN ENGAGE IN A FRAUDULENT SCHEME, WITH THE KNOWING AND SUBSTANTIAL ASSISTANCE OF ENOS, IN CONNECTION WITH THE OFFER AND SALE OF B2G TOKENS

### A.     Defendants' Roles in the B2G Offering

133.     Krstic conducted the B2G ICO with the help of several affiliates located outside of the U.S. who helped him create content for the Bitcoiin2Gen Website and who interacted with investors and promoters who needed assistance.

134.     As with Start Options, DeMarr—Bitcoiin2Gen's "master representative for North America"—used his affiliates and promoter network to help him market, offer, and sell B2G tokens through investor calls, and Bitcoiin2Gen's website, press releases, and social media accounts.

135.     DeMarr worked at the direction of Krstic and his affiliates.  For example, DeMarr sent Krstic and/or Krstic's affiliates the marketing materials he and Enos drafted to review and approve before DeMarr published them.

136.    Krstic and his affiliates also tasked DeMarr with translating the Bitcoiin2Gen White Paper and website into several languages, editing the Bitcoiin2Gen Website, creating "Know Your Customer ("KYC")" policies, drafting a "Technical White Paper," collecting investor funds, and sending a portion of those funds to his bank account in the Philippines.

137.    DeMarr, with Affiliate 1's assistance, accepted U.S. investors' Bitcoiin2Gen investments by credit card, wire transfers, and checks deposited in DeMarr-controlled bank accounts.

138.    Enos provided substantial and knowing assistance to Krstic and Demarr in carrying out their fraudulent scheme.  Enos drafted many of the B2G Marketing Materials, including the Technical White Paper, dozens of press releases, and email blasts containing material misrepresentations that he knew or recklessly disregarded were false and which he at times simply made up out of whole cloth, all while he held ongoing suspicions—which he repeatedly shared with DeMarr—that Krstic and his affiliates were operating a scam.  Enos engaged in this conduct despite knowing the documents he prepared were being published on the internet and sent to prospective investors.  He did so despite his concerns, and his knowledge or reckless disregard of their falsity, because DeMarr was paying him.

139.    DeMarr also instructed his affiliates, including Enos, to falsely name "John Williams" as the author of the Bitcoiin2Gen Marketing Materials they drafted.

140.    Affiliate 2 helped DeMarr to format and publish dozens of press releases promoting the B2G ICO and platform as having been written by John Williams from "Hong Kong, China."  DeMarr and Enos knew or were reckless in not knowing that they were in fact located in California and that B2G had no offices in Hong Kong.

B.      **Defendants Lie to State Regulators to Avoid Interference in Their Scheme**

141.    On March 7, 2018, the New Jersey Bureau of Securities ("NJBS") issued an emergency cease-and-desist order to prevent Bitcoiin2Gen from continuing to conduct unregistered securities offerings there.  The NJBS found, among other things, that "Bitcoiin violated the law by failing to disclose key material facts to prospective investors, including the identities of its principals, the physical address of its business, and the risks associated with the Bitcoiin investments."

142.    To prevent the NJBS' action from undermining the success of their fraudulent scheme, DeMarr asked Enos to draft a response to the NJBS order.  DeMarr asked another affiliate, Attorney 1, a lawyer who had no prior knowledge of Bitcoiin2Gen or digital assets, to allow this letter to be published on his letterhead and under his name.

143.    On March 8, 2018, Bitcoiin2Gen published this letter on its website, and issued a press release announcing:  "Our lawyer would like to provide the following information to refute the allegations made against us."  The press release attached a letter from Bitcoiin2Gen's purported attorney to the NJBS, and provided a legal and factual argument as to why a B2G token was not a security but instead was a so-called "utility token."

144.    The response letter contained several material misrepresentations, which Krstic, DeMarr, and Enos knew or recklessly disregarded were false.  The letter, for example, claimed that: (1) Attorney 1 had been retained by Bitcoiin2Gen; (2) Bitcoiin was domiciled in Hong Kong; and (3) Bitcoiin2Gen "has built a trading exchange, the express purpose of which is to facilitate owners of its currency, and other cryptocurrencies, trading fiat currencies back and forth."

145.    Two weeks later, on March 22, 2018, the Tennessee Department of Commerce &

Insurance Securities Division ("TDCI") issued an investor alert entitled "Tennessee Securities Team Alerts Investors to Internet Crypto Company 'Bitcoiin.'"  The alert referenced the NJBS cease and desist order alleging the company promoted the sale of unregistered securities and cautioned investors that the "none of the companies, promoters, or investments related to Bitcoiin are registered with the TDCI."

146.    DeMarr again asked Enos to draft a response, which he sent to DeMarr for review, and then on to Krstic and his affiliates for publication.  On or about March 26, 2018, Bitcoiin2Gen published another press release, attaching this letter response on Attorney 1's letterhead.  Through the letter, Defendants again knowingly or recklessly falsely conveyed that Attorney 1 represented Bitcoiin2Gen, and that Bitcoiin2Gen was domiciled in Hong Kong, which Defendants knew or recklessly disregarded was false.

147.    Defendants also sought to mislead state regulators into concluding that the B2G ICO had terminated, to avoid further scrutiny of their conduct.  In that same letter, Defendants (on the letterhead of Attorney 1) falsely stated that "Bitcoiin B2G was, until 5:00 p.m. today, March 26, 2018, Hong Kong time, selling its cryptocoins in an Initial Coin Offering ("ICO"). That sale closed at close of business today, Hong Kong time, and remains closed permanently."

148.    At or about that same time, DeMarr told his affiliates and promoters to stop marketing B2G tokens publicly, to take down all websites, videos, and social media, and to cease all webinars.

149.    But contrary to their public announcement, Krstic, DeMarr, and Bitcoiin2Gen's other promoters continued to solicit and receive funds from new and current investors for additional B2G tokens through at least the end of May 2018 by, among other things, email solicitation and private Facebook groups.  DeMarr also told his affiliates and promoters that he

had allocated $1 million additional tokens to be sold "privately."

150.    In total, during the B2G ICO Period, Bitcoiin2Gen raised approximately $7.2 million (approximately $3 million in fiat and $4.2 million in digital assets) from more than 435 investors.  This included $1 million from at least 100 investors that Defendants solicited from March 26, 2018 through the end of May 2018, after they had knowingly or recklessly, and falsely, represented to state regulators that the B2G ICO had terminated.

C.    **Krstic and DeMarr, with the Substantial and Knowing Assistance of Enos, Made Material Misrepresentations to Investors in Connection with the B2G Offering**

151.    To raise funds in its offering, Bitcoiin2Gen, Krstic, and DeMarr knowingly or recklessly, made additional materially false and misleading representations to investors, with the substantial and knowing assistance of Enos, concerning virtually every aspect of the company and the offering, and omitted facts necessary to make those statements not misleading.

1.    **Misrepresentations Regarding Bitcoiin2Gen's Offices and Principals**

152.    Throughout the B2G ICO, Krstic, as he did during the Start Options scheme, hid his true identity behind the fake name "Felix Logan" to promote the company through the Start Options Website, social media, and press releases.  For example:

a.    On February 7, 2018, Krstic, using the Twitter handle "Felix Logan @felixlogan_cfo," retweeted a link to a Start Options press release entitled "Start Options CFO Mr. Felix Logan said Bitcoiin2Gen looks as if it will be the next big thing and we are on board."

b.    On February 7, 2018, Krstic used @felixlogan-cfo to tweet: "brilliant point" and re-tweeted @BitcoiinGen's post, stating "The most important part of our @Bitcoiin2G is that it is self sustainable, the whole eco system is in place without the need of third party intervention."

c.    On February 8, 2018, Krstic used @felixlogan-cfo to tweet: "ICO looks [to] be doing very well.  Early congrats to the folks @BitcoiinB2G" and linked to an article about Bitcoiin2Gen from crunchbase.com.  That same day he tweeted "So my next lambo will be bought with @Bitcoiin2G."

d.      On February 12, 2018, Krstic used @felixlogan-cfo to tweet, "We are very happy to see @seagalofficial . . . appointed as brand ambassador for @bitcoiin2gen that adds credibility, integrity and authenticity.  Good luck #bitcoiin2gen from Start Options," and linked to Bitcoiin2Gen's press release announcing "Zen Master Steven Seagal Has Official Become the Brand Ambassador of Bitcoiin2Gen."

153.    DeMarr also misled prospective and actual investors about his own background. For example, in the February 15 Investor Call, DeMarr held himself out as an "expert" in the digital asset space, having "over eight years' experience in the cryptocurrency market."  DeMarr knew or recklessly disregarded that his statements were false:  He had no such expertise or experience in the cryptocurrency market, and had only begun investing in and learning about digital assets in approximately 2017.

154.    DeMarr also knowingly misled prospective and actual investors by having Enos draft and issue each of the company's press releases under the fictitious name "John Williams," in part to obscure his own role in the fraudulent scheme, and in part to add the false appearance of an independent author, separate from his own role as a promoter of the B2G token.

155.    Enos knew or recklessly disregarded that his use of this fictitious name in the company's press releases, which he undertook at the explicit direction of DeMarr, was materially false and misleading.  In fact, Enos himself invented the fictitious name "John Williams," knowing that the press releases he drafted with that fake name would be disseminated to the investing public.

156.    The foregoing misrepresentations were material, and Defendants prepared and disseminated them to add a false veneer of credibility to their fraudulent scheme.

   2.    **Defendants Fabricated a Hong Kong Address for Bitcoiin2Gen and DeMarr Falsely Represented That He Had Personally Verified the Validity of Bitcoiin2Gen's Operations**

157.    The B2G Marketing Materials, including the press releases that Krstic, DeMarr and Enos helped to draft and publish, falsely stated as early as February 2018 that Bitcoiin2Gen had a Hong Kong office (or falsely represented the press releases were being issued from Hong Kong), when, in fact, the company had no presence in Hong Kong.

158.    Krstic, as the principal behind Bitcoiin2Gen, knew or recklessly disregarded that this representation was false.  DeMarr and Enos also knew this representation, which they also made to NJBS and TDCI (¶¶141-147, *supra*) was false.  DeMarr, in fact, expressly directed Enos to pick a random address in Hong Kong to use as a fictitious address in press releases and on the Bitcoiin2Gen Website.

159.    These misrepresentations were material and Defendants knowingly or recklessly prepared and disseminated them to add a false veneer of credibility for Bitcoiin2Gen to prospective and actual investors.

160.    DeMarr also lied to prospective investors that he had actually visited the nonexistent "Hong Kong" office, to misrepresent his due diligence about the company.  For example, in a February 9, 2018 email to a promoter, who was preparing background slides about DeMarr for an upcoming investor webinar, DeMarr knowingly or recklessly, and falsely, claimed that he took "4 trips to visit all operations of Start Options and [Bitcoiin2Gen] including the last 12 day trip of 18 hr work days – 7 days a week in their offices in Hong Kong and Manila," which, as DeMarr knew or recklessly disregarded, the promoter then shared with prospective investors on telephone calls and in other marketing materials.

161.    DeMarr repeated his lie that he visited Bitcoiin2Gen's purported Hong Kong offices on a February 15, 2018 Investor Call.  In reality, DeMarr took only one trip to Manila, Philippines, where he visited Start Options' purported offices, and never made a trip to Hong Kong.

### 3.    Misrepresentations Regarding Use of Investor Proceeds

162.    Bitcoiin2Gen, Krstic, and DeMarr made representations that were materially false and misleading regarding how they would use investor funds, and omitted material facts necessary to make those representations not misleading.

163.    The B2G Marketing Materials, which Krstic and DeMarr created and published on the internet or emailed to investors, claimed that investor funds would be invested in Bitcoiin2Gen, which would use the funds to create the Bitcoiin2Gen platform, including the B2G token, a digital wallet, and other features.

164.    DeMarr also separately made representations to investors regarding how the company would use their invested funds.  For example, on the February 15, 2018 Investor Call, DeMarr stated the company's goal was to "develop the ICO, launch the coin, get any technology bugs resolved, get the exchange completely vetted, ready to go for everybody . . . Get the credit card done . . . This is probably going to take between 80 to $120 million and about 2 years' worth of work at a minimum."

165.    Similarly, the Bitcoiin2Gen White paper stated that the money raised in the B2G ICO "would make it possible to implement the project quicker and also include a larger marketing manufacturing [sic], technical development team . . . to facilitate all of our goals efficiently and cost-effectively," which according to the timeline, included purchasing and deploying mining machines, developing the platform, and launching the tokens.

166.    In another example, on March 9, 2018, Bitcoiin2Gen announced in a press release that Bitcoiin2Gen had reached the ICO "soft cap" of $75 million, which meant that "all the infrastructure, mining rig construction, marketing and website infrastructure is funded."

167.    During the Relevant Period, DeMarr received approximately $4.3 million in fiat currency from Start Options and Bitcoiin2Gen investors collectively.  He wired approximately $2 million to a bank account in the Philippines at Krstic's direction, and of the remainder, DeMarr spent approximately $1.8 million of it on himself (more than $1 million of which he spent during the B2G ICO Period).

168.    These expenses included more than $170,000 in payments on the lease of a Porsche automobile (as well as additional BMW and Jeep payments), more than $600,000 to pay off his personal credit cards, at least $78,000 for house renovations, and approximately $400,000 toward the repayment of personal loans.

169.    In October 2018, long after the fraudulent scheme had collapsed and investors were unable to obtain any refunds of their investments, DeMarr used investor funds to fund a personal trip to Cabo, Mexico.

170.    Nowhere in the B2G Marketing Materials or in any of the investor calls did DeMarr or Krstic disclose that DeMarr would be using nearly half of the fiat currency he raised for his own personal use.  This material omission made their claims regarding the use of funds materially false and misleading.

171.    Krstic and DeMarr knowingly or recklessly made these false and material representations and omissions.  DeMarr was responsible for diverting the funds for his own benefit.  DeMarr and his affiliates sent Krstic daily investor reports indicating how much money DeMarr was collecting from investors, and Krstic therefore knew or recklessly disregarded that

nearly half of the funds DeMarr raised in fiat currency were being diverted to DeMarr and not being used to develop the Bitcoiin2Gen platform.

### 4. Defendants Misleadingly Tout Celebrity Steven Seagal as an Investor

172.   On February 12, 2018, Krstic used the @felixlogan_cfo handle to tweet "We are very happy to see [Steven Seagal] has [sic] appointed as brand ambassador for @Bitcoiin2G that adds credibility, integrity and authenticity in the project," and linked to Bitcoiin2Gen's press release announcing Seagal as Bitcoiin2Gen's "Brand Ambassador."

173.   On that same date, Defendants issued a press release under DeMarr's fictitious "John Williams" identity announcing that Seagal was the "brand ambassador" and that, after "reviewing their new business plan," Seagal was "also a participant in this new cryptocurrency ICO."

174.   Similarly, on the February 15, 2018 Investor Call, DeMarr claimed that Steven Seagal was an investor in the B2G ICO.

175.   Defendants continued to tout Seagal's involvement with the B2G ICO in press releases issued on February 23 and March 7, 2018, and on the Bitcoiin2G website.

176.   As Defendants knew or recklessly disregarded, however, these representations were false and misleading because Seagal was not an investor in the B2G ICO, but rather, on the contrary, was a paid promoter.  Krstic, with the participation of Enos and DeMarr, had contracted with Seagal to pay him $250,000 in fiat currency for that purpose, and had in fact paid him $120,000 as of February 12, 2018.

177.   These misrepresentations were material, and Defendants disseminated them to investors to add credibility to their scheme and induce investors to purchase B2G tokens.

178.   Defendants never disclosed to investors that Seagal was not a Bitcoiin2Gen

investor, and failed to disclose that he was a paid promoter until March 8, 2018—only after the NJBS issued its cease-and-desist order, which noted Bitcoiin2Gen's failure to disclose what, if any, compensation it had paid Seagal for his promotional activities. Even then, Defendants failed to disclose the amount of Seagal's compensation. By that date, Defendants had already raised $3.8 million in funds from investors.

179.    Defendants' misrepresentations were material, and their failure to disclose the promotional agreement and payments to Seagal made their public statements regarding Seagal materially false and misleading.

### 5.    Misrepresentations Regarding the B2G Token and "Coin"

#### a.    Defendants Falsely Represented to Investors that They Were Issuing B2G Tokens to Them on the Ethereum Blockchain

180.    In the B2G Marketing Materials, including press releases disseminated as early as February 9, 2018, Defendants represented that once investors opened an account and provided "KYC" information to the "platform," "a deposit of Bitcoiin B2G opens a door to all the curtains inside Aladdin's cave. Dollars buy B2G; B2G tokens can be exchanged back into dollars, or for Euros, or for other national fiat currencies. B2G holdings can be traded for original bitcoin or other altcoins."

181.    Defendants knew or recklessly disregarded that these claims were materially false and misleading when they made them. Defendants in fact never transferred B2G tokens to investors, a fact they never disclosed to investors. Rather, Krstic and his affiliates created a token "smart contract" called Bitcoiin2Gen "B2G"—not a mineable cryptocurrency—on the Ethereum blockchain, but they never transferred these tokens to investors on the Ethereum blockchain.

182.    Instead, Krstic and his affiliates created a fictitious online user interface for investors on the Bitcoiin2Gen website.  When investors logged on, they viewed what appeared to be purported B2G tokens.  In reality, they never held B2G tokens because they did not exist.

183.    Defendants knew or were reckless in not knowing that the B2G tokens did not actually exist on the Ethereum blockchain for investors at the time they published their statements.

184.    This elaborate website purporting to show B2G tokens trading was materially misleading.  And as Defendants knew or recklessly disregarded, the purported tokens could not, contrary to claims made in the B2G Marketing Materials on B2G's website, be traded for fiat currency or legitimate digital assets because they were never actually issued to investors on the Ethereum blockchain.

### b.    Defendants Falsely Represent the B2G "Coins" Had Launched and Were Trading

185.    Defendants also made numerous material misrepresentations to prospective and actual investors about the technology behind B2G tokens in press releases, white papers, and direct communications.  They falsely claimed that B2G tokens were the "world's first self-sustaining cryptocurrency" using blockchain technology, that they incorporated "proof-of-work" technology, that they would be one of the world's only mineable tokens, and that they would trade on secondary markets as of the March 25, 2018 launch date.

186.    As early as March 26, 2018, in the letter purportedly drafted by Attorney 1 and posted on the Bitcoiin2Gen Website, Defendants began publicly representing that the B2G token had become a "fully-functioning cryptocurrency" that was now "market-based" with values set by the "world market."

187.    Defendants also repeatedly misrepresented that the value of B2G tokens would

be supported by the commitment of Dragon Mining, and its purported "massive array" of mining equipment.  For example, on or about March 23, 2018, DeMarr and Enos drafted, Krstic and his affiliates approved, and DeMarr disseminated, a press release stating that "the fundamentals of the Bitcoiin B2G opportunity remain the same – i.e., a strong foundation in the Ethereum blockchain; strong mining support through the commitment of Dragon Mining's massive array of mining rigs; and fast processing time."

188.    For example, on April 2, 2018, DeMarr caused to be published a press release entitled "Bitcoiin B2G - Conversion to Mineable Cryptocurrency," which falsely stated: "Now that the ICO has closed, Bitcoiin B2G can be mined."

189.    Similarly, on or about April 3, 2018, DeMarr and Enos helped to draft and publish, and Krstic and his affiliates approved, a press release entitled "Bitcoiin B2G - Conversion to Mineable Cryptocurrency," which falsely stated that Bitcoiin2Gen ended its ICO sale on March 26, 2018, and "[n]ow this new cryptocurrency has entered its mature phase . . . as a mineable cryptocurrency."  It also stated that "[s]avvy players can still purchase Bitcoiin B2G tokens, trade Bitcoiin B2G for other cryptocoins, or hold their positions and wait to see what the price will do on the global market."

190.    Defendants also knowingly or recklessly misrepresented to investors that they had created a successful trading platform, and had achieved a very large market capitalization after the purported close of the ICO at the end of March 2018.

191.    On April 9, 2018, for example, Bitcoiin2Gen announced that the B2G token was now "live and listed on our cryptocurrency exchange Thorex.net."

192.    That same day, Enos drafted and DeMarr published a press release under the John Williams pseudonym that falsely claimed "Thorex.net implements instant transfers from

Bitcoiin B2G, or other cryptocurrencies held in Thorex.net wallets, to fiat currencies." The Thorex website stated that it "is the most user friendly crypto currency exchange," that it charged a fixed fee of 1.5% on every successful transaction, and that it offered "safe and fast transactions."

193. Defendants, while continuing to offer and sell B2G tokens, repeatedly issued press releases that touted the company's purported market capitalization and prices at which B2G tokens were trading.

194. For example, Enos drafted, DeMarr caused to be published, and Krstic approved, the following press releases:

a. An April 13, 2018 press release announcing that "Bitcoiin B2G [is] Now 16th-Ranked Cryptocurrency," with a total market cap of nearly $2 billion, which "reflects a 59.1% upswing in value, over the last 24 hours, as charted by worldcoincharts.com."

b. An April 17, 2018, press release entitled "Bitcoiin B2G Now the 12th-Ranked Cryptocurrency" according to "WorldCoinCharts (www.worldcoincharts.com)."

c. An April 18, 2018 press release entitled "Bitcoiin B2G coin value surges past $60, now $3B market cap," which stated that the Bitcoiin B2G token was "currently trading at $60.01."

195. Defendants' representations (1) that B2G had become a mineable coin, whose value was set by world markets, (2) that the coin was tradeable on Bitcoiin's purported Thorex platform, and (3) that it had achieved the foregoing "total market caps" were fictional.

196. Bitcoiin2Gen, in reality, was a sham. No B2G coin was ever issued or distributed on the Ethereum blockchain at all and, as noted above, no B2G tokens were ever even delivered to investors in the first place. Their representations about the viability of the "Thorex" platform, and the market capitalization figures for the purported trading in the B2G were a complete fiction.

197.    Defendants knew or recklessly disregarded that the foregoing claims were false.  They were familiar, first, with the relevant digital asset websites that would have readily revealed the nonexistence of any B2G tokens on the Ethereum blockchain.  They were also familiar with websites that published price and trading volumes of digital assets at the time, none of which reflected that B2G was trading anywhere.

198.    In fact, Defendants referred to a completely fictional website— "worldcoincharts.com"—in press releases as purported authority for their phony trading and market capitalization figures.  They fabricated that website themselves to create the false appearance of an independent website that ranked and tracked the trading activity of legitimate digital assets.  By email dated April 3, 2018, for example, Krstic's affiliates emailed DeMarr and Enos, asking them to review several "under construction sites [including worldcoincharts.com] and suggest necessary changes."

199.    Krstic created worldcoincharts.com, in fact, to mimic as closely as possible the independent and well-known digital asset website www.coinmarketcap.com (with which Defendants were familiar).  That website displays a list of the top 100 digital assets by market capitalization, and unlike Defendant's fabricated worldcoincharts.com, never listed the B2G token.

200.    Throughout April 2018, however, Defendants continued their deception, even as investors unsuccessfully attempted to withdraw funds from Start Options and/or trade B2G tokens (as Defendants had promised they could) and complained to DeMarr and Krstic's affiliates that they were unable to do so.

201.    Start Options, Bitcoiin2Gen, and Defendants brushed off investor inquiries with terse responses.  For example, an April 23, 2018 email from "Thorex Assistance" to an

investor stated that "[a]fter reviewing your account and your contract terms with Start Options we have come to a conclusion that unfortunately, you have not met the requirements for the withdrawal since you are still in the 90 days' time frame in the ongoing program"—despite the fact that the investor had already exceeded that holding period.

202.    DeMarr began discouraging his downstream promoters from instructing investors on how to withdraw funds.  On April 10, 2018, DeMarr emailed one of the promoters: "stop telling people to withdraw right now.  The sites [Bitcoiin2Gen and Start Options] are being updated for small bugs here and there.  People need to wait another week or so.  You are causing problems."

203.    On or about April 19, 2018, one investor emailed DeMarr that he had "tried making an exchange in thorex for about a week with no success . . . I've sent thorex 3 emails with screenshots showing everything and they have not responded . . . I need the money asap to pay my bills, but they won't answer my questions."

204.    On April 22, 2018, DeMarr emailed Krstic's affiliate that he had received "100's of emails" from investors complaining that they were unable to withdraw from Thorex.

205.    In May 2018, one investor emailed DeMarr:  "Who owns and controls 'World Coin Charts'?," asking "[w]hy is it the only website that ranks B2G? And . . . on that website, why is B2G the ONLY coin that does not show a chart reflecting its price history?"  DeMarr did not respond to these questions, and at no time did DeMarr or Krstic disclose to investors that the B2G token was not tradeable or trading.  Nor did they disclose that they had created the website that purported to show it was—worldcoincharts.com—to deceive them into believing the B2G token was trading.

206.    In early March, moreover, DeMarr, who was already aware of accusations that Start Options was a scam, was asked by Krstic's affiliate to create a "Technical White Paper" that would purport to describe the operation of the B2G token on the Ethereum blockchain. DeMarr assigned that task to Enos, whom DeMarr knew had limited prior knowledge with or about digital asset protocols, and knew nothing about how Bitcoiin2Gen purportedly functioned.

207.    To create content for this White Paper, Enos, at DeMarr's direction, cut and pasted portions of White Papers he found on the internet—including as depicted below, from the original Ethereum Whitepaper—into a document called "Bitcoiin B2G --Technical White Paper" that purportedly "describes Bitcoiin B2G generally, then purportedly presents granular descriptions of elements of the Bitcoiin algorithm, which is an implementation of the Ethereum algorithm."

208.    Enos sent DeMarr, Krstic, and others from Bitcoiin2Gen the 12-page Technical White Paper he drafted to review.  Krstic's affiliates made minimal changes and then published it to the Bitcoiin2Gen Website on or about March 12, 2018.

209.    This fictitious white paper was materially misleading to prospective investors.  Enos and DeMarr were aware that Enos, without any direct knowledge of the purported B2G platform, created the Technical White Paper simply by cutting and pasting portions of other white papers for other digital assets that he found on the internet, as directed by DeMarr.  Further, Demarr and Enos knew, or were reckless in not knowing, that this Bitcoiin2Gen white paper was, from a technical perspective, nonsensical, describing the B2G token and its functionality in a way that it could not feasibly operate.  And despite the paper's extensive description of Bitcoiin2Gen's "mining process," Enos and DeMarr were aware of and

discussed at the time numerous complaints that Dragon Mining—the entity that was supposedly creating the company's mining servers—was a fraud.

210.    Defendants nonetheless knowingly or recklessly published the white paper for the purpose of adding credibility to their false claims that Bitcoiin2Gen was a legitimate enterprise actively developing a genuine digital asset that would be delivered on the Ethereum blockchain.

211.    During April and May 2018, while disseminating the foregoing misrepresentations and while investors were unable to withdraw their funds, Defendants succeeded in soliciting more than $550,000 from investors in exchange for B2G tokens, during which time DeMarr spent at least $230,000 of investor funds on his personal expenses.

### 6.    Misrepresentations Regarding the Offering's Success

212.    Between March 9, 2018 and April 18, 2018, Defendants helped Bitcoiin2Gen publish over a dozen press releases and posts on social media that falsely touted the purported success of the B2G ICO by grossly exaggerating the amount of money the ICO raised.

213.    For example, on February 27, 2018, Krstic re-tweeted the following Bitcoiin2Gen tweet:  "We would like to thank everyone for supporting our ICO and helping us reach over half our soft cap in 30 days."

214.    On March 8, 2018, Enos drafted, Krstic reviewed, and DeMarr caused to be published a press release announcing Bitcoiin2Gen had reached the "soft cap" of $75 million for the ICO "in record fashion."  Krstic also re-tweeted this announcement from the Felix Logan twitter account.

215.    A March 19, 2018 email blast that Bitcoiin2Gen sent to ICO participants entitled "Are you missing out the opportunity to invest in B2G ICO? [sic]" noted that the company had "Total capital $227M raised so far (Very Near to Hard Cap goals $250M)."

216.    Bitcoiin2Gen's U.S.-based bank account records, the relevant wallet addresses, and Bitcoiin2Gen's Coinpayment account, reflect that the B2G ICO (comingled with Start Options investor funds) raised only approximately $5.3 million from January 27, 2018 through March 18, 2018.  Based on these facts and the refusal or inability of Defendants ultimately to pay redemptions to aggrieved investors (*see* ¶ 237 below), Defendants' claims of having raised more than $200 million were materially inflated.

217.    Krstic and DeMarr knew or were reckless in not knowing that these numbers were highly inflated.  DeMarr had visibility into nearly all of the U.S. investors' fiat currency investments and any investments made using digital assets were sent to a public wallet address. And Krstic knew how much investor funds DeMarr brought in personally, as well as the amount that had been contributed to the digital asset wallets under his control.

218.    The foregoing misrepresentations were material to prospective and actual investors, and Defendants disseminated them for the purpose of lending credibility to their fraudulent scheme.

## VI.    AFTERMATH OF THE FRAUDULENT OFFERINGS

219.    In total, the Bitcoiin2Gen raised approximately $7.2 million in digital assets and fiat from January 27, 2018 to May 31, 2018 ($3 million in fiat and $4.2 million in digital assets as measured in USD valued at the time of the ICO) from at least 435 investors, including those who purchased B2G tokens after the ICO purportedly had ended.

220.    On April 27, 2018, Krstic used the handle @felixlogan_cfo to tweet "the time has come for me to find new challenges and opportunities, therefore I would like to inform everyone that I am no longer part of Startoptions."

221.     That same day, Krstic's associate emailed DeMarr to advise him that the owner "has sold his share in Start Options and all his other shares in Dragon mining and all other interested ventures to do with crypto mining."

222.     DeMarr emailed Krstic's "Felix Logan" email account with the subject "Your [sic] out!" and asked "[w]hy did you not tell me you were selling out. We had many agreements that were not completed." Krstic did not reply.

223.     On April 28, 2018, a Start Options press release declared that the company had been sold to Russian venture capitalists.

224.     On or about May 3, 2018, Enos emailed Associate 1: "Any news on the big cash out? You and John flying to Europe?" Associate 1 replied, "Yes, as I'm sure you've heard by now, [t]he whole thing just blew up and its [sic] all John's fault."

225.     On or about May 8, 2018, DeMarr told certain investors and promoters by email that he had communicated with Bitcoiin2Gen's principals and secured a buyer for $25 dollars per token in a "bulk sale," and asked whether they wanted to participate.

226.     Investors immediately began emailing DeMarr asking him to sell their B2G tokens for them in this bulk sale and sent him their "BTC wallet receiving address." DeMarr and Associate 1 kept track of these investors' tokens for sale in a handwritten document.

227.     On May 14, 2018, DeMarr emailed these same investors and promoters with an "update," writing that the bulk sale process "looks like it will finalize from the 23-25th."

228.     On or about May 21, 2018, DeMarr flew from Los Angeles to Podgorica, Montenegro, purportedly to meet the buyer for the "bulk sale."

229.     At no time during this period did DeMarr alert investors that the project had "blown up." To the contrary, he strove to maintain the illusion that the company was still

operational, and the company continued to put out press releases touting purported developments, including an email from "B2G Support" to investors stating that B2G tokens would soon be made available to trade on major digital asset trading platforms such as Binance.

230.    On May 23, 2018, DeMarr flew back to Los Angeles from Montenegro.

231.    The next day, Affiliate 1 emailed a colleague of DeMarr's who was also a private investigator with the subject "Attempted Murder of John DeMarr."  Affiliate 1 wrote that DeMarr had landed in Montenegro with "2,424 BTC Bit Coin with a value of . . . 25 million US dollars in a private trade exchange that the company had set up," but that DeMarr had been physically attacked in Montenegro by two Bitcoiin2Gen affiliates, and shortly thereafter "the account was zeroed out and the money taken by the company."

232.    Rather than face disgruntled investors upon his return to the U.S., DeMarr fabricated a story regarding his disappearance and enlisted Enos and Attorney 1 to assist.

233.    Enos drafted a letter, the contents of which DeMarr dictated to Enos over the telephone when he was already back in the United States, and, on May 30, 2018, Attorney 1 sent an email to B2G investors with the subject "John DeMarr" that attached that letter, on Attorney 1's letterhead.  The letter stated as follows:

> I have been hired by the Estate of John De Marr and his Family to send out this letter.  The action of sending out this letter was prepared on May 14, 2018 "as a precaution before John DeMarr's trip to Montenegro . . . in the event of something going wrong or something happening to him overseas.  The worst has happened.  Currently John is missing.  All his communication devices are not responding.  DO NOT email him.  DO NOT call or text his phone as we do not know who has these devices.  The family has been in contact with the proper authorities . . . to try and locate him and assure his well being but to all extents and purposes he has disappeared. . . .  He made this trip to try and help those with account problems, gather updates directly from the company, and to collect the funds from the sale of the coins to the Russian bulk buyers.  As of now, there is no update that can be provided about Start Options, B2G or Thorex. You will need to contact the companies directly.

234.    The letter also stated that DeMarr expected to receive 2,424 BTC for investors, but that all of these funds had been "wiped out" and "gone as of today."

235.    On June 1, 2018, Enos drafted, and Attorney 1 sent under his letterhead and signature, a similar letter to an investor, stating that "DeMarr is currently missing, location unknown but believed to be in the Balkans.

236.    As DeMarr and Enos knew, these letters were false.  By the time they had been sent, DeMarr had already returned to California, and had asked Enos to write these letters to avoid facing the victims of his fraudulent scheme.

## VII.    DEFENDANTS STOLE MILLIONS OF DOLLARS FROM INVESTORS AS PART OF THEIR FRAUDULENT SCHEME

237.    During the Relevant Period, Defendants obtained approximately $11.4 million of investor funds from the Bitcoiin2Gen and Start Options offerings, including fiat currency and digital assets—none of which has been returned to investors.  Start Options, Bitcoiin2Gen, Krstic, and DeMarr did not provide investors with any sort of digital asset as promised; nor did they return any funds to investors, despite investors' repeated requests to redeem their funds.

238.    Of this total, Krstic, retained at least $9 million when he exited the schemes. Krstic then either ignored or refused requests for refunds from investors.  DeMarr, as discussed above, misappropriated approximately $1.8 million, at least, of investor funds, which he spent for his personal purposes.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Krstic and DeMarr)

239.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 238.

240.    Defendants Krstic and DeMarr, directly or indirectly, singly or in concert, in

the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

241.     By reason of the foregoing, Defendants Krstic and DeMarr, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5
### (Krstic and DeMarr)

242.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 238.

243.     Defendants Krstic and DeMarr, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

244.     By reason of the foregoing, Defendants Krstic and DeMarr, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Aiding and Abetting Violations of Securities Act Section 17(a)**
**(Krstic and DeMarr)**

245.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 238.

246.     As alleged above, Start Options and Bitcoiin2Gen violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)(2)].

247.     Defendants Krstic and DeMarr knowingly or recklessly provided substantial assistance to Start Options and Bitcoiin2Gebn with respect to their violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

248.     By reason of the foregoing, Defendants Krstic and DeMarr are liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Start Options' and Bitcoiin2Gen's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Defendants will again aid and abet these violations.

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5**
**(Krstic and DeMarr )**

249.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 238.

250.     As alleged above, Start Options and Bitcoiin2Gen violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

251.     Defendants Krstic and DeMarr knowingly or recklessly provided substantial assistance to Start Options and Bitcoiin2Gen with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

252.     By reason of the foregoing, Defendants Krstic and DeMarr are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Start Options' and Bitcoiin2Gen's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and, unless enjoined, Defendants will again aid and abet these violations.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Enos)

253.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 32, 98-166, 172-211 and 219-236.

254.     As alleged above, Bitcoiin2Gen, and Defendants Krstic and DeMarr, violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)(2)].

255.     Defendant Enos knowingly or recklessly provided substantial assistance to Bitcoiin2Gen, and Defendants Krstic and DeMarr, with respect to their violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)]

256.     By reason of the foregoing, Defendant Enos is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting the violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] by Bitcoiin2Gen, and Defendants Krstic and DeMarr and, unless enjoined, Defendant Enos will again aid and abet these violations.

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5
### (Enos)

257.     The Commission re-alleges and incorporates by reference here the allegations

in paragraphs 1 through 32, 98-166, 172-211 and 219-236.

258.     As alleged above, Bitcoiin2Gen, and Defendants Krstic and DeMarr, violated

Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

thereunder.

259.     Defendant Enos knowingly or recklessly provided substantial assistance to

Bitcoiin2Gen and Defendants Krstic and DeMarr with respect to their violations of Exchange

Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

260.     By reason of the foregoing, Defendant Enos is liable pursuant to Exchange Act

Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting the violations by Bitcoiin2Gen, and

Defendants Krstic and DeMarr, of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule

10b-5 [17 C.F.R. § 240.10b-5] thereunder and, unless enjoined, Defendant Enos will again aid

and abet these violations.

## SEVENTH CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and 5(c)
### (Krstic and DeMarr)

261.     The Commission re-alleges and incorporates by reference here the allegations

in paragraphs 1 through 238.

262.     Defendants, directly or indirectly, singly or in concert, (i) made use of means

or instruments of transportation or communication in interstate commerce or of the mails to sell,

through the use or medium of a prospectus or otherwise, securities as to which no registration

statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to

be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

263.     By reason of the foregoing, Defendants violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**EIGTH CLAIM FOR RELIEF**
**Violations of Exchange Act Section 15(a)**
**(DeMarr)**

264.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 238.

265.     DeMarr, as a natural person not affiliated with a broker or dealer which is a person other than a natural person, made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security without being registered with the Commission as a broker-dealer.

266.     By reason of the foregoing, DeMarr violated, and, unless enjoined, will again violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Enter a Final Judgment finding that Defendants violated the securities laws and rules as alleged against them here;

55

**II.**

Permanently enjoining Defendants and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**III.**

Permanently enjoining Defendants Krstic and DeMarr and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating, directly or indirectly, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)];

**IV.**

Permanently enjoining Defendant DeMarr and each of his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating, directly or indirectly, Exchange Act Section 15(a) [15 U.S.C. § 78o(a)];

**V.**

Prohibiting Defendants from participating, directly or indirectly, in the issuance, purchase, offer, or sale of any digital asset security;

**VI.**

Permanently barring Krstic and DeMarr from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**VII.**

Ordering Defendants to disgorge with prejudgment interest all ill-gotten gains from the conduct alleged in this Complaint pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7);

**VIII.**

Ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**IX.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
          February 1, 2021

/s/ Richard R. Best
Richard R. Best
A. Kristina Littman
John O. Enright
Richard G. Primoff
Alison R. Levine
Pamela Sawhney
Jon A. Daniels
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281